**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| ANTHONY GRAVES-BUCKINGHAM,<br><br>Plaintiff,<br><br>v.<br><br>MARKWAYNE MULLIN, *Secretary, Department of Homeland Security*,[1]<br><br>Defendant. | Case No. 22-cv-1459 (JMC) |

**MEMORANDUM OPINION**

The Federal Emergency Management Agency (FEMA) fired Anthony Graves-Buckingham just as he was coming to the end of his one-year probationary period as a new employee. FEMA attributes that decision to Graves-Buckingham's habit of arriving to work late and the fact that he had more than one outburst—yelling and, as he describes it, losing his temper—directed towards his supervisor. Graves-Buckingham says the real reason is because of his race and disability. He draws that conclusion primarily from several remarks his supervisor made to him about his race and another comment she made about his use of medication to treat attention deficit hyperactivity disorder. Because Graves-Buckingham has not put forward evidence from which a reasonable jury could conclude he was fired based on his race or disability—rather than his tardiness and behavior—the Court **GRANTS** FEMA's motion for summary judgment.[2]

---

[1] Secretary Mullin has been substituted for his predecessor in office. *See* Fed. R. Civ. P. 25(d).

[2] Unless otherwise indicated, the formatting of citations has been modified throughout this opinion, for example, by omitting internal quotation marks, emphases, citations, and alterations and by altering capitalization. All pincites to documents filed on the docket in this case are to the automatically generated ECF Page ID number that appears at the top of each page.

## I.    BACKGROUND

Unless otherwise indicated, the following facts are undisputed. The Court recounts these facts "in the light most favorable" to Graves-Buckingham. *Talavera v. Shah*, 638 F.3d 303, 308 (D.C. Cir. 2011).

Anthony Graves-Buckingham began working at FEMA in October 2016. *See* ECF 27-1 ¶ 2; ECF 28-2 ¶ 2. FEMA required Graves-Buckingham to spend the first year of his employment in a "one-year probationary period." ECF 27-1 ¶ 6; ECF 28-2 ¶ 6. That period was "intended" to give FEMA "an opportunity to assess [Graves-Buckingham's] overall fitness and qualifications for continued employment." ECF 27-1 ¶ 7; ECF 28-2 ¶ 7.

Almost immediately, Graves-Buckingham had trouble getting to work on time. Although he was initially told to arrive by 7:30 AM, a month after he started he requested and was granted permission to come in by 8:00. *See* ECF 27-1 ¶¶ 8, 11; ECF 28-2 ¶¶ 8, 11. Despite that change, Graves-Buckingham was regularly arriving late. *See* ECF 27-6 at 2–10.[3] So in January 2017, Graves-Buckingham's supervisor—Sheila Thomas—had a conversation with him "about his lateness." ECF 27-1 ¶ 14; ECF 28-2 ¶ 14. Thomas addressed Graves-Buckingham's tardiness again in his quarterly performance reviews in April and July of 2017, and once more in a meeting in October 2017. *See* ECF 27-1 ¶¶ 15–17; ECF 28-2 ¶¶ 15–17. All told, FEMA's records show that Graves-Buckingham arrived late to work "on more than one hundred days" during his one-year probationary period. ECF 27-1 ¶ 12; ECF 28-2 ¶ 12 (Graves-Buckingham disputing

---

[3] In his opposition, Graves-Buckingham objected to the admissibility of these "logbooks"—which are electronic records documenting when FEMA employees used their "Personnel Identification Verification" cards to "swipe[] in and out of FEMA controlled spaces," ECF 29-1 ¶¶ 5–6—arguing that they had not been "authenticated." ECF 28-2 ¶ 12. In its reply, FEMA filed a declaration from an employee responsible for maintaining these records. *See* ECF 29-1. That declaration makes clear that FEMA would be "capable" of authenticating the logbooks at trial. *Wilburn v. Robinson*, 480 F.3d 1140, 1143 n.2 (D.C. Cir. 2007); *see* Fed. R. Evid. 901(a).

authenticity of these records and whether Thomas reviewed them but, as discussed below, failing to point to record evidence creating genuine dispute about the number of days he arrived late).

Meanwhile, Graves-Buckingham was having other issues with Thomas. At meetings in April 2017 and again in October 2017, Graves-Buckingham and Thomas yelled at each other. *See* ECF 27-1 ¶¶ 18–20; ECF 28-2 ¶¶ 18–20 (Graves-Buckingham adding context but not denying that he yelled); *see also* ECF 28-3 at 37 (Graves-Buckingham testifying about one of these meetings and acknowledging that he "yell[ed]" and "lost [his] temper," as did Thomas). After both of those incidents, Thomas attempted to "counsel" Graves-Buckingham. ECF 27-1 ¶¶ 19, 21; ECF 28-2 ¶¶ 19, 21. And after the October incident, Thomas went further, reaching out to a FEMA employee relations specialist for advice. *See* ECF 27-1 ¶ 23; ECF 28-2 ¶ 23; ECF 27-10 ¶¶ 2–3. That person advised Thomas to either issue Graves-Buckingham an official reprimand or, alternatively, a notice of termination. *See* ECF 27-1 ¶ 24; ECF 28-2 ¶ 24. Thomas initially drafted a letter of reprimand. *See* ECF 27-1 ¶ 25; ECF 28-2 ¶ 25. But after Thomas sent the letter to the employee relations specialist for his review, the specialist encouraged Thomas to fire Graves-Buckingham instead. *See* ECF 27-1 ¶ 26; ECF 28-2 ¶ 26. Thomas accepted that recommendation and, a few days before the end of Graves-Buckingham's one-year probationary period, issued him a notice of termination. *See* ECF 27-1 ¶ 27; ECF 28-2 ¶ 27. In the notice of termination, Thomas told Graves-Buckingham that he was being fired because he "repeatedly failed to . . . arrive to work on time" and because he "engaged in discourteous and unacceptable behavior when [he] yelled and screamed at [Thomas]" and exhibited "inappropriate and disrespectful behavior in other meetings" when he "flailed [his] arms" and "clenched [his] fist and pointed [it] at [Thomas] when [he] became angry." ECF 27-4 at 2.

Graves-Buckingham says those reasons are disingenuous and were not the actual cause of his firing. Instead, Graves-Buckingham says he was discriminated against on the basis of race—Graves-Buckingham is Black—and disability—he has attention deficit hyperactivity disorder (ADHD). ECF 27-1 ¶ 1; ECF 28-2 ¶ 1. In support of his claim of race discrimination, Graves-Buckingham points to comments Thomas made to him throughout his time working for her. When Graves-Buckingham told Thomas—who is a Black woman, *see* ECF 27-1 ¶ 4; ECF 28-2 ¶ 4—about the difficulties he was experiencing in his divorce, Thomas told him that she "knew [he was] married to a white woman, because there's no way a sister would have" done the things Graves-Buckingham's then-wife was doing. ECF 28-3 at 17–18. When Graves-Buckingham "couldn't remember if Black History Month was in January or February," Thomas told him that he needed to have his "[B]lack card revoked." *Id.* at 21. When Graves-Buckingham told Thomas that he swims, Thomas responded by saying "don't you know [B]lack people don't swim." *Id.* at 15. When Graves-Buckingham told Thomas that he was "familiar" with South Central Los Angeles during a conversation about an upcoming trip of hers, she told Graves-Buckingham that she was "surprised that [he] even kn[e]w about that part of Los Angeles." *Id.* at 23.[4] And Thomas asked Graves-Buckingham if he even "kn[e]w what soul food is" and whether he had a "problem with [B]lack females." *Id.* at 32; ECF 28-1 at 9.[5] As for Graves-Buckingham's disability, he points to an incident in which Thomas told him he should not "tell[] people" that he takes ADHD medication because

---

[4] "[T]he term South Central Los Angeles gradually entered the local vernacular by the 1920s. 'South Central' became a blanket term for all of Black Los Angeles from Central Avenue to Watts to the Crenshaw District." Mike Sonksen, *The History of South Central Los Angeles and Its Struggle with Gentrification*, PBS SoCal (Sept. 13, 2017), https://perma.cc/Y548-FMU7.

[5] The only testimony suggesting Thomas made the remark about "[B]lack females" is a declaration that FEMA says the Court should disregard as a sham. *See* ECF 28-1 at 9 (citing Wilson Decl. ¶ 9); ECF 29 at 5–6. The Court has real doubts about FEMA's argument that this affidavit runs afoul of the sham affidavit rule but can merely assume without deciding that the affidavit is admissible and that Thomas did say this. For all the reasons explained below, this comment does not change the outcome of this case.

people might "use it against" him. ECF 28-3 at 34–35 (Graves-Buckingham reaffirming this allegation from the complaint); *see also id.* at 42 ¶ 22 (exhibit discussed during deposition).

Together, Graves-Buckingham says, these comments reveal that Thomas's issues with him "were based on [his] race and disability," because he "simply did not conform with Thomas's image of a neurotypical, African American male." ECF 28-1 at 2–3. Graves-Buckingham brought this lawsuit on that theory, alleging that his termination violated Title VII of the Civil Rights Act and the Americans with Disabilities Act. *See* ECF 1 ¶¶ 36–46. After discovery, FEMA moved for summary judgment. *See* ECF 27.

## II.    LEGAL STANDARD

The Court will grant a motion for summary judgment only "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). In evaluating the motion, "[t]he evidence is to be viewed in the light most favorable to the nonmoving party and the court must draw all reasonable inferences" in that party's favor. *Talavera*, 638 F.3d at 308. "There is no issue for trial unless there is sufficient evidence favoring the nonmoving party for a reasonable jury to return a verdict for that party." *Id.* "The mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff." *Id.*

"[A] party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). But where the moving party does not bear the burden of proof at trial, it need not "support its motion with affidavits or other similar materials *negating* [its] opponent's claim." *Id.* The party opposing summary judgment must then "identify evidence that a

reasonable jury could credit in support of each essential element of [their] claims." *Grimes v. District of Columbia*, 794 F.3d 83, 94 (D.C. Cir. 2015). To carry that burden, the opponent must "cit[e] to particular parts of materials in the record" or "show[] that the materials cited" by the moving party "do not establish the absence . . . of a genuine dispute." Fed. R. Civ. P. 56(c)(1). "The court need consider only the cited materials." Fed. R. Civ. P. 56(c)(3).

## III.    ANALYSIS

Although Graves-Buckingham brought his disability discrimination claim under the Americans with Disabilities Act, FEMA rightly points out that the Rehabilitation Act of 1973 is "the exclusive remedy for employment discrimination based on a disability for federal employees." *Ahmed v. Napolitano*, 825 F. Supp. 2d 112, 115 (D.D.C. 2011). FEMA does not move for summary judgment on this basis, instead "liberally constru[ing]" Graves-Buckingham's claim as being brought under the Rehabilitation Act and addressing it on the merits. ECF 27 at 8 n.1. The Court follows FEMA's lead and addresses Graves-Buckingham's claims as arising under Title VII and the Rehabilitation Act.

"[T]he two essential elements" of both claims "are that (i) [Graves-Buckingham] suffered an adverse employment action (ii) because of [his] race, color, . . . national origin, . . . or disability." *Baloch v. Kempthorne*, 550 F.3d 1191, 1196 (D.C. Cir. 2008). FEMA has not moved for summary judgment on the first element—nor could it, Graves-Buckingham was fired. Instead, FEMA says it is undisputed that Graves-Buckingham was late more than 100 times and twice yelled at his manager during meetings. ECF 27-1 ¶¶ 12, 18, 20. Those are the reasons FEMA gave Graves-Buckingham when it told him he was fired, *see* ECF 27-4 at 2, and FEMA argues that no reasonable jury could find that those were not the true reasons for his firing and that he was actually fired because of his race and disability. In response, Graves-Buckingham argues that there is a genuine dispute about the reason for his firing because he has marshalled both "direct [and]

6

circumstantial evidence" of unlawful discrimination. *Dunaway v. Int'l Bhd. of Teamsters*, 310 F.3d 758, 763 (D.C. Cir. 2002). But none of the evidence Graves-Buckingham points to would allow a reasonable jury to find that he was fired because of his race or disability, and not because of his habitual tardiness and behavior towards his supervisor.

### A. Graves-Buckingham does not have direct evidence that he was fired because of his race or disability.

Graves-Buckingham's front-line argument is that he has "direct evidence" that his "terminat[ion] . . . was discriminatory." ECF 28-1 at 8. That evidence consists of the many comments Thomas made to Graves-Buckingham about his race and the one comment about his ADHD. As it must at this stage, the Court assumes Thomas made these statements. If Graves-Buckingham is right that the comments constitute direct evidence that he was fired because of his race or disability, he is almost certainly "entitle[d] . . . to a jury trial." *Ayissi-Etoh v. Fannie Mae*, 712 F.3d 572, 576 (D.C. Cir. 2013).

"Direct evidence of discrimination is evidence that, if believed by the fact finder, proves the particular fact in question *without any need for inference*." *Seed v. Regan*, 643 F. Supp. 3d 129, 137 (D.D.C. 2022). For that reason, courts have explained that "discriminatory comments" qualify as direct evidence a plaintiff was subjected to an adverse employment action because of a protected characteristic where the comments were "made by a decisionmaker" and "tied temporally and contextually to the challenged employment action." *EEOC v. R&R Janitorial, Painting, & Bldg. Servs., Inc.*, No. 21-cv-2539, 2025 WL 2409751, at *7 (D.D.C. Aug. 20, 2025). Put differently, discriminatory comments only constitute direct evidence if they have "some nexus" to "the adverse employment decision." *Abdelhamid v. Lane Constr. Corp.*, 744 F. Supp. 3d 10, 20 (D.D.C. 2024).

The comments Graves-Buckingham points to do not qualify as direct evidence of discrimination because they lack the required "nexus" to his termination. *Abdelhamid*, 744 F.

Supp. 3d at 20. True, they were all "made by a decisionmaker" involved in his firing—Thomas. *R&R Janitorial*, 2025 WL 2409751, at *7. But none were tied "contextually" to the firing. *Id.* None of the comments suggest that Thomas's biases or animus towards Graves-Buckingham were related to his termination. Thomas did not, for instance, make comments indicating that she held "inaccurate and stigmatizing stereotypes" connecting Graves-Buckingham's race or disability with his inability to arrive on time or combative behavior. *Wilson v. Cox*, 753 F.3d 244, 248 (D.C. Cir. 2014). Nor were any of Thomas's comments "made in the course of explaining or justifying" her decision to terminate Graves-Buckingham. *R&R Janitorial*, 2025 WL 2409751, at *8. Instead, each of the statements would only lead to a finding of intentional discrimination if a jury made an inferential leap from the statement itself: that Thomas was biased against or held animus towards Graves-Buckingham because of his race or disability, *and* that Thomas terminated Graves-Buckingham because of that bias or animus. A jury that concludes Thomas made the alleged statements could find the first of those propositions true yet not make the inferential leap to the second. The statements are therefore not direct evidence of discrimination.

## B. Graves-Buckingham has not created a genuine dispute about the reason he was fired.

That leaves Graves-Buckingham to attempt to prove his case, like most plaintiffs in employment discrimination cases, through circumstantial evidence. Because FEMA has proffered non-discriminatory reasons for Graves-Buckingham's termination—his tardiness and behavior— the "burden-shifting framework" used to assess circumstantial evidence in employment discrimination cases "falls away." *Allen v. Johnson*, 795 F.3d 34, 39 (D.C. Cir. 2015). Instead, the "central question becomes whether" Graves-Buckingham "produced sufficient evidence for a reasonable jury to find that [FEMA's] asserted nondiscriminatory . . . reason was not the actual reason and that [FEMA] intentionally discriminated . . . against" Graves-Buckingham. *Id.* In

8

answering that question, the Court considers "all of the evidence, . . . mean[ing] any combination of (1) evidence establishing the plaintiff's prima facie case; (2) evidence the plaintiff presents to attack the employer's proffered explanation for its actions; and (3) any further evidence of discrimination that may be available to the plaintiff, such as independent evidence of discriminatory statements or attitudes on the part of the employer." *Holcomb v. Powell*, 433 F.3d 889, 897 (D.C. Cir. 2006).

Graves-Buckingham relies on three types of evidence to try to rebut FEMA's proffered reason and establish a genuine dispute. First, he points back to Thomas's statements. *See* ECF 28-1 at 9–10. And Graves-Buckingham is right that although those statements do not constitute direct evidence of discrimination, they are circumstantial evidence "that must be considered by the Court in conjunction with the other evidence." *Said v. Nat'l R.R. Passenger Corp.*, 317 F. Supp. 3d 304, 322 (D.D.C. 2018), *amended on reconsideration*, 390 F. Supp. 3d 46 (D.D.C. 2019), *aff'd*, 815 F. App'x 561 (D.C. Cir. 2020). Second, he suggests that there is a dispute about whether he was in fact regularly late. And third, Graves-Buckingham attempts to rely on comparative evidence to show that FEMA "treated other employees . . . more favorably." *Brady v. Off. of Sergeant at Arms*, 520 F.3d 490, 495 (D.C. Cir. 2008); *see* ECF 28-1 at 10–11.

The Court starts with the latter two arguments before returning to Thomas's statements. As for Graves-Buckingham's attempt to cast doubt on FEMA's explanation for his firing by showing that he was not regularly late, he has not pointed to any evidence that creates a genuine dispute about his tardiness. To show that Graves-Buckingham was frequently late, FEMA put forward "logbooks" documenting when Graves-Buckingham "swipe[d] in and out of" his FEMA office. ECF 27-1 ¶ 12; ECF 29-1 ¶¶ 5, 7. That document shows Graves-Buckingham was late more than 100 times. *See* ECF 27-6.

9

To try to create a genuine dispute about that fact, Graves-Buckingham (1) argued the logbooks have not been authenticated, (2) cited a section of his own deposition, and (3) pointed out that Thomas did not look at the logbooks before deciding to fire him. *See* ECF 28-2 ¶ 12. The Court has already explained why the authenticity objection is unfounded. *See supra* 2 n.3. Nor in the cited portion of the deposition does Graves-Buckingham create a genuine dispute about whether he was frequently late. The closest Graves-Buckingham comes there is when he alludes to some "discrepancies" with "dates" that he "thought were incorrect" when he "went through" the record with his lawyer—for instance, "dates listed" on the logbook "where [he] either traveled or was traveling for work." ECF 28-3 at 12–13. But Graves-Buckingham never expanded on those discrepancies and, crucially, never testified that he was not regularly late to work, or even that he was on time on a single date the records said he arrived late. The Court, as it must, credits Graves-Buckingham's testimony that he "thought" some dates on the list "were incorrect," *id.* at 13, but that at most amounts to a "mere . . . scintilla" of evidence suggesting inaccuracies in the logbooks, *Talavera*, 638 F.3d at 308. That is insufficient to create a genuine dispute about FEMA's records and what they reveal about Graves-Buckingham's punctuality.

Finally, that Thomas did not look at the records before firing Graves-Buckingham does not create a dispute about Graves-Buckingham's recurring timeliness problem. The records document Graves-Buckingham's regular lateness regardless of whether Thomas learned about that lateness from the records themselves or—as Thomas testified—from observing Graves-Buckingham arriving late. *See* ECF 28-4 at 21. Graves-Buckingham has therefore failed to "cit[e] particular parts of materials in the record" that create a genuine dispute about how regularly he arrived late or that "show[] . . . the [logbooks] do not establish the absence . . . of a genuine dispute" about the fact that he was late more than 100 times. Fed. R. Civ. P. 56(c)(1).

10

Graves-Buckingham has not created a genuine dispute about whether FEMA "treated other employees . . . more favorably," either. *Brady*, 520 F.3d at 495. "To prove that he is similarly situated to another employee," Graves-Buckingham "must demonstrate that he and the allegedly similarly situated employee were charged with offenses of comparable seriousness" and "that all of the relevant aspects of his employment situation were nearly identical to those of the other employee." *Burley v. Nat'l Passenger Rail Corp.*, 801 F.3d 290, 301 (D.C. Cir. 2015). Graves-Buckingham has not identified any other employees who had comparable issues with timeliness— *i.e.*, were late anywhere close to 100 times in a one-year span. Instead, Graves-Buckingham points only to excerpts from Thomas's deposition where she explained that she had never kept track of any "other employee['s] arrival time," ECF 28-4 at 24–25, "made the decision to terminate another employee's employment at FEMA," *id.* at 14, or "counsel[ed] anyone [else] about being late," *id.* at 23; *see* ECF 28-1 at 11 (citing this testimony). All of that is irrelevant unless Graves-Buckingham can identify another employee who was late anywhere close to as regularly as he was.

The same goes for Graves-Buckingham's attempt to show that similarly situated employees also "raised their voices at" Thomas but were not fired. ECF 28-1 at 11. Here, Graves-Buckingham has at least pointed to evidence demonstrating that "other employees . . . raised their voice" to Thomas during her time at FEMA and that Thomas did not "recommend any of those employees for termination." ECF 28-4 at 29–30. Only one of those specific employees is identified in the record, *see id.* at 30, but neither this specific employee's experience nor the experience of any other employee who yelled at Thomas can serve as a meaningful comparator for either discrimination claim. That's because Graves-Buckingham has failed to put forward evidence to establish that these employees were "charged with offenses of comparable seriousness" or were in a "nearly identical" employment situation to Graves-Buckingham. *Burley*, 801 F.3d at 301. It is

11

not clear, for instance, whether any of these employees were also within their one-year probationary period when they yelled at Thomas. Nor is it clear whether any of them also had persistent issues with timeliness.

So Graves-Buckingham has not created a genuine dispute about whether he was in fact late more than 100 times or whether FEMA treated similarly situated employees differently than him. That leaves him to rely only on Thomas's comments. To be sure, Thomas's statements "could lead a reasonable juror to find that she harbored a discriminatory attitude toward" Graves-Buckingham, either based on stereotypes about race or his disability. *Morris v. McCarthy*, 825 F.3d 658, 670 (D.C. Cir. 2016). But Graves-Buckingham "must show more than a general bias against" disabled or Black employees; he "must also introduce enough evidence for a reasonable jury to find that [his firing] was motivated by that bias." *Id.* That is where his evidence comes up short.

As is now clear, Graves-Buckingham has not created a genuine dispute about any "weaknesses in [FEMA's] explanation" or "attempt[ed] to demonstrate that [FEMA] is making up or lying about the underlying facts that formed the predicate" for his firing. *Morris*, 825 F.3d at 670; *Brady*, 520 F.3d at 495. And the sequence leading up to Graves-Buckingham's firing makes it impossible for a reasonable jury to conclude based on Thomas's comments alone that her biases were the cause of Graves-Buckingham's termination. Recall that, near the end of Graves-Buckingham's probationary period—even after the habitual lateness and yelling—Thomas recommended issuing an official letter of reprimand, rather than terminating Graves-Buckingham. *See* ECF 27-1 ¶ 25; ECF 28-2 ¶ 25. It was a human resources employee who recommended firing Graves-Buckingham instead. *See* ECF 27-1 ¶ 26; ECF 28-2 ¶ 26. If Thomas's animus or bias was motivating the decision to terminate Graves-Buckingham, you would have expected her to recommend taking that path. That another employee did so—and that there is no evidence

12

connecting him in any way to Thomas's remarks or bias, *see* ECF 28-2 ¶ 26 (Graves-Buckingham making this same point)—makes it implausible to infer based on Thomas's comments alone that Graves-Buckingham's firing had anything to do with Thomas's alleged bias or animus. Because Graves-Buckingham has no evidence to support his claim other than those comments, no reasonable jury could find that he was terminated because of his race or disability.

The Court does not "discount[]" the statements Thomas made, *Morris*, 825 F.3d at 669, nor does it dismiss the possibility that those comments made it difficult for Graves-Buckingham to work at FEMA. But this is not a hostile work environment claim. And unlike other cases where discriminatory remarks have been found to support intentional discrimination claims, there is no "other evidence" that sits "alongside" these remarks from which a reasonable jury could piece together a "narrative" in which Graves-Buckingham was fired because of his race or disability, rather than his lateness and yelling. *Mayorga v. Merdon*, 928 F.3d 84, 94–95 (D.C. Cir. 2019). There may be other cases where discriminatory remarks alone are sufficient to support that inference; but in this one, they are insufficient to create a genuine dispute for a jury.

\*   \*   \*

FEMA's motion for summary judgment, ECF 27, is **GRANTED**. A separate order accompanies this memorandum opinion.

**SO ORDERED.**

_____
JIA M. COBB
United States District Judge

Date: July 23, 2026

13